EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

ATTORNEYS AT LAW
600 FIFTH AVENUE AT ROCKEFELLER CENTER
10TH FLOOR
NEW YORK, NEW YORK 10020

TEL: (212) 763-5000
FAX: (212) 763-5001
www.ecbawm.com

May 6, 2022

**By ECF**

The Honorable Gary L. Sharpe
United States District Judge
James T. Foley U.S. Courthouse
445 Broadway, Room 411
Albany, NY 12207

   Re: *United States of America v. New York State Board of Elections, et al.*
      10-cv-1214 (GLS)

Dear Judge Sharpe:

  On behalf of New York voters, Belinda de Gaudemar and Susan Schoenfeld ("UOCAVA Plaintiffs"), and together with the Elias Law Group LLP, we write to oppose the State Board of Elections (SBOE)'s May 5, 2022 Letter Motion Requesting a Supplemental Order (ECF No. 92). SBOE asks this Court to modify the permanent injunction it issued in 2012 (the "2012 Order") requiring New York to hold non-presidential federal primary elections on "the fourth Tuesday of June, ***unless and until New York enacts legislation resetting the non-presidential federal primary election for a date that complies fully with all UOCAVA requirements and is approved by this court***." 2012 Order at 8 (Jan. 27, 2012), ECF No. 59 (emphasis added). This year, the fourth Tuesday in June falls on June 28, 2022. Thus, under the clear terms of the 2012 Order, New York is required to hold its 2022 federal primary election on June 28, 2022, unless two conditions are met: (1) New York enacts legislation resetting that date for another that complies fully with UOCAVA, and (2) that alternative date is approved by this Court. Neither is satisfied.

  SBOE chose to ignore the 2012 Order and move the date of New York's 2022 federal primary election without *either* seeking action from the State Legislature *or* approval of this Court. But the terms of the Court's 2012 Order were not only clear, they were put in place to ensure that New York complies with its obligations under UOCAVA and protects the right to vote of New York's overseas and military voters. Delaying the primary election until August 23, 2022 as SBOE has now requested, will severely burden those rights and may to lead to disenfranchisement to lawful voters—including the UOCAVA Plaintiffs here—because of the risk recognized by this Court: a primary election in August does not leave sufficient time to ensure that they will receive their general election ballots in time for those ballots to be timely returned and counted. Accordingly, the UOCAVA Plaintiffs respectfully ask this Court to deny SBOE's request.

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 2

### I.     Background

The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") of 1986, and the Military and Overseas Voter Empowerment ("MOVE") Act of 2009 together guarantee active-duty members of the uniformed services (and their spouses and dependents), and United States citizens residing overseas, the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). To ensure that right was not illusory, starting in 2009, Congress required states to send absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots. 52 U.S.C. § 20302(a)(8)(A). To comply with these statutes and meet its obligations to UOCAVA voters, a state must hold its primary election sufficiently early within the calendar year to allow the state to certify the results of the primary election and print and mail absentee ballots for the general election by the 45-day deadline.

In 2012, after finding that New York failed to meet both this deadline *and* an extended deadline for which it had sought approval from the federal government, this Court issued a permanent injunction against the State of New York for its repeated violations of UOCAVA. To ensure that New York would finally meet its obligations to send ballots to military and overseas voters with adequate time for those voters to return them, this Court ordered the state to conduct its non-presidential federal primary on "the fourth Tuesday in June" in subsequent even-numbered years. *See* 2012 Order. The Court was clear that the only exception would be if "New York enacts legislation resetting the non-presidential federal primary election for a date that complies fully with all UOCAVA requirements and is approved by this court." *Id*. at 8.

Late last week, SBOE announced that, in contravention of this Court's order, it would hold its federal primary on August 23, 2022, citing a state trial court order requiring the move. *See* https://www.elections.ny.gov/ (last visited May 5, 2022). Neither SBOE's announcement nor the state court order so much as mentioned this Court's permanent injunction or the burden that moving the election would impose on New York's nearly 70,000 UOCAVA voters.[1]

On Monday, May 2, several New York voters, including the two UOCAVA voters who are Proposed Plaintiff-Intervenors to this suit, filed a motion for a temporary restraining order (TRO) against the SBOE, asking the Southern District of New York to order SBOE to certify the primary ballot so that New York could proceed with a June primary, as required by this Court. *See de Gaudemar v. Kosinski*, 1:22-cv-03534-LAK (S.D.N.Y. May 2, 2022), ECF No. 4. Although the court denied Plaintiffs' TRO, it also instructed SBOE to seek this Court's consent to change the primary date from the fourth Tuesday in June to the fourth Tuesday in August. Tr. of Oral Argument, *de Gaudemar v. Kosinski*, 1:22-cv-03534-LAK (May 4, 2022), at 23, attached as Ex. 7. The SBOE then applied to this court yesterday, seeking what it termed a "supplemental order" (Dkt. 92) to modify the 2012 Order. This Court should deny that request.

---

[1] *See* U.S. Election Assistance Comm'n, Election Admin. and Voting Survey 2020 Comprehensive Rep. at 198, https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf (last accessed May 2, 2022).

## II. Legal Standard

An application seeking to modify an injunction "must furnish credible evidence of a significant change in facts or law, or bring forward factual matters, that had the Court considered them, might have reasonably altered the result." *Sec. & Exch. Comm'n v. CKB168 Holdings, Ltd.*, 2017 WL 4465726, at *4 (E.D.N.Y. June 20, 2017) (quotations and alterations omitted); *see also New York v. Kraeger*, 972 F. Supp. 2d 291, 294 (N.D.N.Y. 2014) ("The party seeking the modification [of an injunction] carries the burden of demonstrating the significant change in circumstances."). "[T]he moving party bears the burden of showing that continuation of the injunction would be inequitable. . . . [and] must make a showing regarding two elements: that the danger which the decree was meant to foreclose must almost have disappeared, *and* that the movant faces extreme and unexpected hardship." *S.E.C. v. Prater*, 296 F. Supp. 2d 210, 216 (D. Conn. 2003) (quotations and citations omitted).

## III. Argument

### a. Defendants have not satisfied the preconditions necessary for modification of the 2012 Order.

Defendants' request does not comply with the plain terms of the 2012 Order. That Order entered a permanent injunction requiring New York to conduct its federal primary on the fourth Tuesday in June in even-numbered years, "unless and until New York enacts legislation resetting the non-presidential federal primary election for a date that complies fully with all UOCAVA requirements, and is approved by this court." 2012 Order at 8. New York must comply with those conditions to change the date of the federal primary election. Yet, SBOE does not come to this Court under those circumstances. Indeed, no one even suggests that the Legislature has taken the first predicate step necessary to modify the 2012 Order by enacting legislation setting the primary date "for a date that complies fully with all UOCAVA requirements." *Id.* And, as already noted, SBOE announced it was moving the primary *before* it sought approval from this Court.

The only legislation that has been passed sets the state's federal primary date as *the fourth Tuesday of June*, aligning the state precisely with the order this Court set out ten years ago. *See* 2019 Sess. Law News of N.Y. Ch. 290 (S. 6374), N.Y. Elec. Law § 8-100. As the New York Senate explained, the Legislature did so as part of a "package of election reform bills designed to protect our democracy and improve our system of elections," which included "[s]treamlining the primary election calendar" "to consolidate State and Congressional primary elections in June, ending the confusion and expense of multiple major primary dates and reducing burdens on voters and election administrators alike." Rep. & Findings of the N.Y. State S. Elections Comm. (Nov. 15, 2021), at 9, https://nysenate.gov/sites/default/files/press-release/attachment/elex1115_vfinal.pdf, attached as Ex. 1. The New York Legislature, the body tasked with determining the proper time, place, and manner of federal elections in the first place, *see* U.S. Const. art. I, § 4, cl. 1, concluded that New York's primary should the fourth Tuesday in June. It has expressly *not* determined that New York could comply with UOCAVA with a later primary date, and it has not passed any legislation to that effect. As Defendants have not satisfied the preconditions necessary for modification of this Court's 2012 Order, their request should be

Emery Celli Brinckerhoff Abady Ward & Maazel llp
Page 4

denied.

### b. Defendants remain unable to comply with UOCAVA requirements in the event of a delayed primary.

When the time between primary and general election is short, New York has been unable to comply with UOCAVA. In August 2010, New York sought and received a waiver from the Secretary of Defense exempting it from UOCAVA's requirement that ballots be mailed to UOCAVA voters 45 days in advance of the federal general election that year. The State's inability to meet the deadline stemmed from the too-short window between the primary—held in September that year—and the November general election. The waiver permitted the State to mail out UOCAVA ballots 32 days in advance of the federal general election (instead of 45 days in advance), on the condition that ballots returned 13 days after the election would be counted. Yet, even with these allowances, New York was unable to comply in the short window between the primary and the general: ballots in half of New York's counties were mailed later than the extended deadline. 2012 Order at 7.

Given New York's inability to comply with UOCAVA, the Department of Justice sought and obtained the permanent injunction from this Court that was part of the 2012 Order. The June primary date this Court ordered was specifically recommended by the Officers of the New York State Election Commissioners' Association ("ECA"), a bipartisan organization made up of two election commissioners from each of New York State's 62 counties. *See* Letter from N.Y. Att'y General attaching Decl. of Election Comm'rs' Ass'n (Dec. 6, 2011), ECF No. 45, attached as Ex. 2. As those Officers explained, the ECA had previously "voted overwhelmingly to recommend" to the New York Legislature and its Governor that federal primaries be held "the fourth Tuesday of June" to allow "meaningful compliance with the federal MOVE Act." *Id*. ¶ 4. The ECA warned the Court that a later primary, such as in August, would hinder New York election officials' ability to comply with federal law. *See generally id*. (explaining the logistical barriers to complying with UOCAVA and MOVE when a federal primary occurs after June in New York).

In the decade since this Court's order, New York has conducted each of its five congressional primary elections—in 2012, 2014, 2016, 2018, and 2020—on the fourth Tuesday in June. In 2019, New York enacted legislation to permanently set its primary as the fourth Tuesday in June. *See* 2019 Sess. Law News of N.Y. Ch. 290 (S.6374), N.Y. Elec. Law § 8-100.

### c. New York's election administration and the USPS's performance have only gotten worse over the past decade.

There is nothing to indicate that administration of elections or the USPS's performance have improved in the last ten years such that shortening the time between the primary and general election no longer risks disenfranchising UOCAVA voters. To the contrary, both have gotten worse. Last election cycle, multiple federal courts had to issue nationwide preliminary injunctions to ensure the timely delivery of absentee ballots, finding that the Postal Service's practices risked violating candidates' and voters' rights. *See NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1 (D.D.C. 2020); *Jones v. U.S. Postal Serv.*, 488 F. Supp. 3d 103 (S.D.N.Y. 2020). In addition, according to

a November 2021 report from the New York Senate Elections Committee, the New York election system "lacks the oversight, transparency, and accountability mechanisms necessary to serve its vital purposes" and is plagued by "structural flaws" that "tend to have a disproportionate impact on communities most at risk of being disenfranchised…" Ex. 1 at 1. Moreover, "[l]ocal boards of elections vary widely in their capacity, staffing, and resourcing, which can and often does lead to inconsistencies in the implementation of various election laws." *Id*. The Senate Report concludes that "New York's system of election administration demonstrates it is not up to the task" of providing "for public confidence in our elections." *Id*. at 3.

There have been numerous "high-profile" examples of the structural flaws that New York faces, including "thousands" of voters in 2016 learning that they had been purged from voter rolls due to an official's error, *id*. at 10; voters in 2020 receiving "incorrect ballots during the primary election which listed candidates in a neighboring Senate district race," *id*. at 13; "discriminatory treatment" at the polls, *id*.; local boards of elections that "ignored an Executive Order allowing voters to request absentee ballots by phone or email . . . until the deadline to apply for absentee ballots was nearly passed" *id*. at 19; delays by the New York City Board "in mailing large numbers of absentee ballots in the 2020 primary election, creating situations where it was unlikely or impossible that voters would receive ballots in time to legally return them," *id*. at 11; New York City voters in 2020 who "receiv[ed] absentee ballots with the incorrect name and address printed on them," which had to be reprinted and resent to avoid fatal defects with those ballots, *id*. at 12; New York City's "misreporting" of initial primary results which caused "diminished confidence in the agency's technical competence," *id*. at 10; and voters in the 2021 primary receiving "unclear information about poll site location changes" leaving "[m]any people [who] did now know where to go," *id*. at 25. *See also*, Test. Provided to the S. Standing Comm. On Elections, N.Y. State Bd. of Elections Review of Elections Admin. and Voting Rights in N.Y. State, (Sept. 21, 2021), at 9, attached as Ex. 3 (acknowledging problems that came out of the canvass process in New York Congressional District 22 in 2020); Decl. of Ulster Cnty. Comm'r, at 2, attached as Ex. 4 (describing regular recounts including a three week, county-wide recount in 2019).

These structural flaws and rampant, recurring errors cause confusion and depress turnout. And these impacts are worse when elections are divided across separate dates as the SBOE here proposes: "[T]own, village, and other local elections occurring on separate dates from national elections was cited as a factor that reduces turnout," sometimes by more "than half." Holding elections on different days "creates a need to pay for polling inspectors and site chairs for an additional day[, and a]side from the cost burdens on localities, keeping up with elections on odd dates is an unrealistic expectation for most voters." Ex. 1 at 21.

The Senate Report also clarifies the intent behind 2019 legislation to "streamlin[e] the primary election calendar" in which "New York moved to consolidate State and Congressional primary elections in June," was, in part, to "end[] the confusion and expense of multiple major primary dates and reduc[e] burdens on voters and election administrators alike." *Id*. at 9. "Voters depend on timely, accurate communications from election administrators, and deserve a more streamlined process for casting their ballot." *Id*. at 33. Shortening the time for the state and county boards to perform their election tasks between the primary and general elections will only negatively impact their ability to protect the integrity of the election process, comply with laws

designed to protect voters such as UOCAVA, and give the public confidence in the election results. The later UOCAVA ballots are mailed, the less time UOCAVA voters will have to identify and address issues in election administration—not just limited to the late mailing of ballots—that could impede their very right to vote. As the above discussion demonstrates, this is a very real concern for these voters in the current environment.

### d. It is virtually impossible for New York to hold a federal primary on August 23 and comply with UOCAVA.

SBOE's recent failures in election administration raise serious concerns about SBOE's claim that New York will actually be able to comply with UOCAVA if it waits until August 23 to hold the primary. UOCAVA ballots must be printed by September 24, 2022. That is only 32 days after the August 23 primary. The most basic thing that New York must do during that 32-day period is for the county boards to count all of the primary ballots—a process known as canvassing—so that SBOE may then certify the primary election. Under New York law, county boards cannot start canvassing ballots until 9 p.m. on election night. *See* N.Y. Elec. Law §§ 8-100(2), 9-100, 9-102(1). That count cannot be completed until all absentee ballots are in, and New York accepts ballots postmarked by election day and received by the seventh day after the election. N.Y. Elec. Law § 8-412(1). This timeline means, with an August 23 primary date, that ballots that are postmarked by that date may be received until August 30. As a result, in the best-case scenario, with the SBOE's requested August 23 primary, the county boards are finishing the counts a mere approximately 25 days before UOCAVA ballots need to be actually physically mailed out to all of New York's overseas and military voters. That is not realistic.

Because there are other crucial New York laws that the state and county also have to navigate in this short window of time, New York cannot meet its proposed schedule. If an eligible voter submits a ballot that is flagged for rejection due to a curable defect (like if the envelope was unsigned, had a signature that did not correspond to the voter's registration record, or is missing a witness signature if a witness was required), the county boards must provide voters seven *business days* after the board mails a curable rejection notice to the voter to allow the voter the opportunity to cure that ballot. N.Y. Elec. Law § 9-209(3). This means, if a ballot is received on August 30 with a curable defect, the voter will have until Friday, September 9 to cure, even if the board sends the voter notice of a need to cure the same day that the ballot is received. This puts the deadline to cure an absentee ballot three days *after* the deadline for county boards of elections to finish counting ballots (September 5, 2022, which is Labor Day, so it will be moved to September 6 this year). N.Y. Elec. Law § 9-200(1). N.Y. Gen. Constr. Law § 25-a(1). The county boards of election must then recanvass the ballots by September 12 (20 days after the election), N.Y. Elec. Law § 9-208(1).

Notably, New York's new recount law also threatens to expand the schedule. Under that law, effective January 1, 2021, there are several circumstances in which a board of elections must conduct a full manual recount of all ballots for a particular contest. *See* N.Y. Elec. Law § 9-208(3) (noting the criteria for a manual recount and that if the contest involves portions of two or more counties, SBOE must determine the margin of victory based on the recanvasses in the relevant counties). In 2018, a manual recount would have been required in at least three counties, and in

2020, a manual recount would have been required in at least two counties, based on margin of victory. *See* N.Y. State Bd. of Elections Certified Results from June 23, 2020 Primary Election, https://www.elections.ny.gov/NYSBOE/elections/2020/Primary/CertifiedJune232020StatePrimaryResults.pdf (showing narrow margins for NY12 (2020 Dem Primary), NY01 (2018 Dem Primary), NY19 (2018 Dem Primary), and NY23 (2018 Dem Primary)). Only after the recanvass and any recounts are completed may the SBOE certify the results. The deadline for the SBOE to certify the candidates on the general election ballot is the 55th day before the general election—this year, that date is September 14. N.Y. Elec. Law. §§ 9-200(1), 9-202.

***Assuming there are no delays, including from any automatic manual recounts, New York would only have nine days before all UOCAVA ballots need be mailed to overseas and military voters.*** Once SBOE certifies the result of the primary election, the county boards must design ballots, translate them, proof them, print them, make sure they can be read properly by machines, and mail them—all before September 24. If there is a slight delay in *any* of these processes, which are complicated, labor intensive, and often error-prone, it will be impossible to comply with UOCAVA. *See* Decl. of Albany Cnty. Comm'r, at 2, attached as Ex. 5; Ex. 4 at 2-3; Decl. of Putnam Cnty. Comm'r, at 3, attached as Ex. 8; Decl. of Putnam Cnty. Deputy Comm'r at 2-3, attached as Ex. 6. Moreover, county boards have very limited resources with which to accomplish this work. Ex. 3 at 6-7 (noting that more than half of county boards of elections have six or fewer employees).

SBOE has made no showing that it or the county boards will be able to accomplish this significant and complex task. And repeatedly, including in recent years, SBOE and the county boards have fallen critically short in managing a functioning election process. All of the evidence indicates that moving the primary as SBOE now requests will irreparably harm—and likely disenfranchise—lawful New York UOCAVA voters.

   **e. Any inconvenience to New York resulting from enforcement of the Court's order is the responsibility of New York, not this Court.**

This Court explicitly tasked the SBOE with ensuring compliance with the 2012 Order. *See* 2012 Order at 9. Despite that requirement, SBOE was prepared to ignore that Order entirely and implement an August 23, 2022 primary date without ever seeking modification from this Court. SBOE is only here seeking this Court's approval after (1) announcing to the public that the primary date had been moved, (2) being sued in another federal court for noncompliance with this Court's order, and (3) being forced to return to this one. *See* https://www.elections.ny.gov/ (SBOE announcing August 23 primary date); Ex. 7 at 23-24 (Judge Kaplan asking SBOE to "commit to applying to Judge Sharpe for leave to change the primary date" and consenting to Proposed Plaintiff-Intervenors' participation).

In every order it has issued since 2012, this Court has emphasized that New York must obtain this Court's approval *before* changing the primary election date from the fourth Tuesday of June. *See* Suppl. Remedial Order at 2, 5–6 (Dec. 12, 2013), ECF No. 85 (stating (1) "New York's non-presidential federal primary date shall be the fourth Tuesday of June, unless and until New York enacts legislation resetting the non-presidential federal primary for a date that complies fully

with all UOCAVA requirements, *and is approved by the court*;" and (2) "[N]othing herein shall prohibit the State of New York from making statutory changes in its federal office election process to put New York in compliance with the MOVE Act and that such changes, if made, may be implemented in 2014 *upon the determination of this court that such changes render the 2014 election of federal office MOVE Act compliant*") (emphasis added); Suppl. Remedial Order at 1–2, 5 (Oct. 29, 2015), ECF No. 88 (same for 2016); Suppl. Remedial Order at 1–2, 5 (Nov. 21, 2017), ECF No. 91 (same for 2018).

Despite these orders, SBOE stood silent as various actors proposed postponing New York's primary date. The SBOE neither raised a concern with this Court nor ensured that the New York Supreme Court understood that SBOE was bound by this Court's Order. New York's failure to craft a remedial plan that could resolve litigation in time for a June primary should not come at the expense of UOCAVA voters. It was the state's carelessness towards UOCAVA voters that resulted in this Court's order in the first place. Given how little has changed in the past ten years, there remains ample need to allow this Court's permanent injunction to remain in place.

* * *

For the reasons set forth above, this Court should decline to modify the existing permanent injunction.

Dated: May 6, 2022                                           Respectfully Submitted,

ELIAS LAW GROUP LLP                              EMERY CELLI BRINCKERHOFF
                                                                          ABADY WARD & MAAZEL LLP

By: /s/ Aria C. Branch                                     By: /s/ O. Andrew F. Wilson
    Aria C. Branch*                                              O. Andrew F. Wilson
    Haley Costello Essig*                                    600 Fifth Avenue, 10th Floor
    Maya Sequeria*                                            New York, NY 10020
    Christina A. Ford*                                         Tel.: (212) 763-5000
    Daniel Cohen*                                               awilson@ecbawm.com
    10 G St NE, Ste 600
    Washington, DC 20002
    Tel.: (202) 968-4490
    abranch@elias.law
    hessig@elias.law
    msequeria@elias.law
    cford@elias.law
    dcohen@elias.law

*Pro hac vice applications to be submitted.